Gardiner, C. J.,
delivered the opinion of the court.
The bill of exceptions in this case presents two principal questions: First, did the act of 1823, and those amending the same, oblige the pier proprietors to erect and maintain the Columbiarstreet bridge over the basin in the city of Albany? And if so, then, Second, has that obligation been discharged or materially modified by the act of 1849.
The supreme court in 1844 determined that the maintenance of this bridge was a duty imposed upon the proprietors by the statute first mentioned. (The People v. Cooper, 6 Hill, 516.) As no attempt was made to review that decision, *271 the judgment in that case, confirmed by the acquiescence 'ff those interested to contest it, must at least be deemed strong presumptive evidence of the law. The examination in this case, with the aid of able arguments, has satisfied me that the decision was right and should control that of this court on the same question.
The pier, authorized by the act of 1823, was to be constructed upon the property of the state, in a navigable river, from funds to be raised by subscription. The assent of the state, as the act recites, was therefore necessary; but the title to the structure, when completed, was to vest in the subscribers, and the advantages directly accruing from it were for them exclusive benefit. The pier would interrupt the access to the waters of the Hudson river, which the public had enjoyed previously; and the grant of the land and of other privileges conferred by the state was therefore subject, to the condition, that the communication between the main land and the river should be continued by means of bridges extending from the former to the pier, where deemed necessary by the canal commissioners. The bridges were a part of the work to be performed. They were to be constructed under the supervision of the same agents, and out of the same fund with the pier itself.
I have not quoted the language of the statute, but in its whole, scope and spirit it looks to a continuance of the communication which would otherwise be cut off, and which, if important to the public, was indispensable to give value to the pier as private property. The erection of the pier without the permission of the legislature would have been a nuisance, by interrupting the navigation of the river and the access to the main channel from the western shore. This was avoided by a grant of land covered by the pier and of an easement in or over the reserved lands of the state for the erection of the necessary bridges. The Columbia-street bridge was one of these. The grant of the easement did not terminate with the erection of the bridge, nor when *272 it became dilapidated and useless. This the pier owners would be the last to admit; they, in that event, could not enter upon-land covered by the water of a navigable river, at tide water, to repair or reconstruct the bridges, nor could any one else, without the permission of the legislature. The state assumed no such responsibility by the statute in question, and no such duty was imposed upon the sovereign by the common law. The grant of the easement was, in a word, by inevitable implication to those who represented the pier owners and who were bound to construct the bridge in the first instance, and its duration was coextensive with the duty imposed upon the grantees. They were permitted, virtually, to remove the shore of the river to the eastern side of the pier, but they were to furnish a means of access to it as a substitute for that of which they had deprived the public.
It was said that no funds were provided by the act for repairs, and that, as the bridge was for the public convenience, it should be maintained in the same manner with other bridges. The answer to this suggestion is, that the bridge became a convenience to the public, because the pier owners in the construction of a private work destroyed the former passage. To obviate the consequences resulting from their own act, they obtained the right to erect and continue a bridge over the state lands so long as the necessity for the new way existed. They expressly engaged to open the communication in the first instance, and the duty of maintaining it was, by necessary implication, to continue so long as they or their successors persisted, for their own emolument, in debating the public from the exercise of their former privileges. It is said in Rolle’s Abridgement, “ if a man erects a mill for his own profit, and makes a new cut for the water to come to it, and makes a new bridge over it, and subjects used to go over .this as a common bridge, this bridge ought to be repaired by him who has the mill, and not by the county.” (Page 368, Tit. Bridges; 5 Burr., 2598.) There,” says Justice Aston in commenting on this case, “the *273 private emolument continued to the person who erected it, and it was not reasonable for him to make the county contribute whilst the private benefit continued to himself.” In the present case the new work which separated the dock at the foot of Columbia-street from the bed of the Hudson was the pier, the property of individuals, which, without the bridge, would have been comparatively worthless. The pier owners assumed to erect it in aid of a private speculation, they for years kept it in repair, and would doubtless have continued to discharge this duty had they not supposed that by subsequent legislation they were relieved from the burden, while they were allowed to retain the advantages of their enterprise.
The cases to which reference has been made by the counsel of the People, prove no more than this; that, by the law of England, public bridges are to- be maintained by the several counties; and that a sufficient structure of this kind, erected by individuals, and used and adopted by the public; becomes prima facie a public bridge. (5 Burr., 2598; 2 East, 342.) But this presumption may be rebutted, as in the case from Rolle and in that from 13 East, 220, by evidence that the bridge was erected for private profit, or was substituted for a former passage way, which was destroyed by a company in the exercise of a franchise granted by parliament primarily for the advantage of the company. In the case last referred to, the act authorized a company to improve the navigation of the River Medway, and for that purpose to alter the highways and bridges, “ leaving them, or others, as convenient for passage.” The locus in quo was a ford which was deepened; and as a substitute, ‘ a bridge had been erected by the company, which had been used by the public and for the non-repair of which the county was indicted. The company bad complied with the letter of the statute by “leaving a bridge which was as convenient for passage,” and probably more so, than the ford; but they, like the pier owners in *274 the case before us, had permanently interrupted the ancient way by an improvement for their own benefit; and it was held, that they must not only “ leave a sufficient bridge.” but that they must maintain it.
We were told that the expenses for necessary repairs to the pier and lochs, and for attending the latter, are provided for by the 9th section of the act, while no mention is made of bridges. The section quoted does not create any obligation whatever. This results from other provisions of the statute. That section merely secures the prompt performance of the duties specified, which relate to the navigation of the basin (a subject in which the state was" interested), by making the expenses a charge upon the tolls in the hands of the receiver appointed by the pier owners. It neither defines or limits the duties of the proprietors, but secures the performance of'those enumerated by creating a lien for certain expenses, which, otherwise, must have been defrayed in the usual manner. This view is confirmed by the act of 1825, passed at the solicitation of the proprietors, in which their general obligation to repair the pier and lock is expressly affirmed. (Laws of 1825, p. 400.) And lastly, the act of 1835, although inoperative as a law, from not receiving a vote of two-thirds of the members of the legislature, may, notwithstanding, be considered as an exposition of the views entertained by their predecessors in passing the law of 1823. By that act, the pier owners are required to pay the excess in value of new bridges over the old, and to maintain, attend and keep them in repair, “ as they now are required to be tended, kept in repair and maintained.” (Laws of 1835, p. 171, §§ 1 and 2.) If, therefore, the act of 1823 was a contract between the state and the proprietors of the pier, the declarations of one of the parties, as to its construction, accord with the acts of the others, through a series of years, and both harmonize with the principles of the common law and the adjudication of the former supreme court upon the same question.
*275 I have dwelt longer upon this branch of the case, because that decision has been questioned in a quarter entitled to respect, and because, in my opinion, the rights and obligations of the pier proprietors, established by the act of 1823, are unaffected by the law of 1849, so far as they relate to the subjects presented by this bill of exceptions.
I am aware that it was claimed upon the argument, that in consequence of the release executed to the state by the proprietors, in pursuance of the statute last mentioned, the bridges are now as much the property of the state as the basin itself.
To this proposition there are several answers. First, by the ordinary rules of interpretation, the release of a majority of the pier owners must be restricted to the subjects in reference to which the parties were treating. Those, subjects were the tolls, the claims against the state under the laws mentioned in the seventh section of the act, and the equivalent to be paid for their relinquishment. There is not an allusion to bridges to be found in the statute. Second, by the 5th section all prior grants by Letters Patent to the pier owners are expressly confirmed. The act of 1823 made the construction of the bridges over the state land a condition precedent of the grant by the state, and, by implication, as all concede, created a permanent right of way for that purpose. By confirming the grant the legislature ratified its conditions and incidents. The sloop lock, which was also to be erected before the grant took effect, was built on land conveyed for that purpose. If the parties did not contemplate a surrender of the fee in the one case, it is clear that the act does not call for a surrender of the easement in the other. Third, if the act of 1823 and that of 1849 are considered as different contracts in relation to the same general subject, the first must stand unless modified by the last. Now the section conferring the right to tolls is the only one which is expressly repealed by the act of 1849, and no such repugnancy *276 between the two statutes has been pointed out, as renders a repeal of any other provision of the act of 1823 a subject of necessary implication. It is true that the 9th section of the act of 1849 provides “ that the basin shall remain free for canal craft, and shall be owned by and remain the property of this state.” The waters of the basin were a part of the Hudson, and of course open to all citizens. The land under water was the property of the state, and always had been. The tolls imposed for the improvement of the navigation, the only interest which the pier owners had in the basin as such, were relinquished to the state, which of course was remitted to its former right of sovereignty, without the qualification imposed in this respect by the former statute. The clause in question, of itself, conferred no right. It was simply declaratory of that which would have been equally true and equally apparent had the clause been omitted altogether. And finally, there is no foundation in these statutes, or either of them, for the assumption that the basin was a part of the Erie canal. By the first act, the canal commissioners were to compute the tolls in the same manner as if the basin were a part, of the canal. As the tolls were to be fixed by the state, the same compensation was secured to the pier owners for the use of the basin, that might be exacted for the use of the Erie canal for the same distance. This standard of computation did not, however, make the basin the canal or any part of it. This was so held by the Chancellor in Hart v. The Mayor of Albany (3 Paige, 213), referred to above. The only additional provision in the law of 1849, bearing upon this subject, is found in the 9th section, which declares that the tolls shall thereafter be considered as forming a part of the canal revenues, and that the basin should be under the charge of the canal commissioners. The phraseology of the first clause excludes the idea of identity between the tolls upon the canal and basin. The revenues of the canals are appropriated by. the *277 constitution. The tolls for this work are, by this act, considered as forming a part of' these; but the next legislature might direct their application to pay the current expenses of the government without infringing upon that instrument. Nor are the duties of the canal commissioners necessarily restricted to the supervision of the state canals. Navigable waters communicating with and effecting the business of the canals may, with propriety, be put under the charge of those officers, without working a total change in the character of the new subject. If the legislature supposed that the effect of the statute would be to make the basin a part of the Erie canal, the existing laws would at once be applicable, and the commissioners would, ex officio, be charged with its superintendence and control. That they deemed a special provision necessary to impose the duty, is very satisfactory evidence that no such consequence was designed or contemplated.
This view disposes of the case without determining the other questions which were presented upon the argument.
The judgment of the supreme court should be reversed, and a new trial awarded.
All the judges, except Johnson, J., who took no part in the decision, concurred in the foregoing opinion.
Judgment reversed.